UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JAKETRIUS LURRY, et al.,                                                    Plaintiff

v.                                              Civil Action Lead Case No. 3:23-cv-297-RGJ

PHARMERICA CORPORATION,                                                  Defendants

## MEMORANDUM OPINION & ORDER

Plaintiffs David Hibbard, Frank Raney, James Young, Holly Williams, Micaela Molina, and Charley Luther ("Plaintiffs") request that the Court grant final approval of the nationwide class action settlement with Defendant PharMerica Corporation ("PharMerica"), and for attorneys' fees, expenses, and class representative service awards. [DE 156]. PharMerica does not oppose Plaintiffs' motion. The Court received a letter from Class Member John Bosk. [DE 157]. A Final Approval Hearing[1] was held on May 12, 2026. [DE 162]. Pursuant to the Court's order at the Final Approval Hearing, Plaintiffs filed supplemental briefing on June 2, 2026. [DE 164]. This matter is ripe. For the following reasons, Plaintiffs' motion [DE 156] is **GRANTED.**

## I. BACKGROUND

PharMerica is a pharmacy services provider for various healthcare facilities and programs nationwide. [DE 38 at 506].  PharMerica collects and maintains personal identifiable information ("PII") and protected health information ("PHI") (collectively, "personal information") of its

---

[1] The Settlement Agreement is attached as Exhibit A to Plaintiffs' unopposed motion. [DE 146-1]. All capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Settlement Agreement. [*See, e.g., id.* ("'Final Approval Hearing' means the hearing held before the Court during which the Court will consider granting Final Approval of the Settlement and the Application for Attorneys' Fees, Costs, and Service Awards.")].

1

clients' patients and employees.  [*Id.* at 507].  Plaintiffs allege that in March 2023 a cybercriminal ransomware gang targeted PharMerica's computer network and exfiltrated 4.7 terabytes of information, including Plaintiffs' personal information (the "Data Incident"). [DE 146 at 983–83]. Thereafter, Plaintiffs filed their individual complaints, which were consolidated into the instant matter on July 19, 2023. [DE 20].

On October 16, 2023, after reviewing multiple competing motions for appointment, this Court entered an order appointing J. Gerard Stranch, IV of Stranch, Jennings, & Garvey, PLLC as Interim Lead Counsel, E. Michelle Drake of Berger Montague, P.C., Gary M. Klinger of Milberg Coleman Phillips Grossman, PLLC, and Lynn A. Toops of CohenMalad, LLP, as Executive Committee Co-Members, and August Herbert of Gray Ice Higdon as Liaison Counsel. [DE 31].

On November 30, 2023, Plaintiffs filed their Consolidated Class Action Complaint. [DE 33]. Subsequently, on January 12, 2024, Plaintiffs filed their First Amended Consolidated Class Action Complaint. [DE 38].

On June 12, 2024, the Court granted in part and denied in part PharMerica's motion to dismiss. [DE 46]. Shortly thereafter, the parties exchanged informal discovery regarding the Data Incident, including details as to how the incident occurred, who was involved, the specific data elements impacted, liability, and damages. [DE 146 at 983–84]. Then, on August 1, 2025, the parties engaged in formal mediation which resulted in an agreement to settle. [*Id.* at 984]. Over the next several weeks, the parties finalized the Settlement Agreement, including by working with Kroll Settlement Administration, LLC ("Kroll" or the "Settlement Administrator"), to create the Notice Program and Notices, and to formulate the Claims Process and draft the Claim Form. [*Id.*].

### A. Settlement Agreement

#### 1. *The Settlement Class*

Under the Settlement Agreement, the Settlement Class is defined as "all living persons in the United States who were provided notice of the Data Incident." [DE 146-1 ¶ 59]. Excluded from the Settlement Class are:

> [A]ll persons who are directors and officers of Defendant, governmental entities, anyone who validly and timely opts out of the Settlement, and the judge(s) assigned to the Action, the Judge's immediate family, and Court staff.

[*Id.*] Any Class Members, as defined above, will have until thirty (30) days before the initial scheduled Final Approval Hearing to opt out of the Settlement. [*Id.* ¶ 46].

#### 2. *Settlement Benefits*

The Settlement Agreement creates two funds: a Settlement Fund and a Claims-Made Fund. First, PharMerica shall pay $5,275,000.00 into a non-reversionary fund (the "Settlement Fund"). Following the payment of: (1) all Settlement Administration Costs, (2) PharMerica's past and future costs of data mining to confirm membership in the Settlement Class; (3) any Service Awards awarded to Class Representatives; and (4) attorneys' fees and costs as awarded to Class Counsel, the Settlement Fund will provide Class Members with the ability to claim a cash payment that will be increased or decreased on a *pro rata* basis. [DE 146-1 ¶¶ 65-66, 70(b)].

In addition to the Settlement Fund, PharMerica will pay claims for documented out-of-pocket expenses up to $10,000 per Class Member and one year of Kroll Complete Monitoring on a claims-made basis (the "Claims-Made Fund"). [*Id.* ¶¶ 70-71]. Kroll Complete Monitoring includes credit monitoring, dark web monitoring, pay day loan monitoring, social security scan, fraud consultation, identity theft restoration services (including victim assistance and customer support), $1,000,000 of insurance coverage for fraud and/or identity theft with no deductible, credit

3

score reporting, and real-time inquiry alerts. [*Id.* ¶ 71]. Class Members will have until fifteen (15) days before the initial scheduled Final Approval Hearing to submit a claim. [*Id.* ¶ 55].

Lastly, the Settlement Agreement provides that PharMerica has adopted, paid for, implemented, and will maintain certain "Business Practice Changes" related to information security to safeguard personal information on its systems. [*Id.* ¶ 72.]

### 3. Notice Program

Within 14 days of preliminary approval, PharMerica will provide Kroll with a list of Class Members. [DE 146 at 986]. Kroll will administer the Notice Program by sending Email Notices and/or Postcard Notices, depending on the type of information maintained by PharMerica. [*Id.*]. Pursuant to the Settlement Agreement,

> The Notice shall include a description of the material terms of the Settlement; how to submit a Claim Form; the Claim Form Deadline; the Opt-Out Deadline for individuals in the Settlement Class to opt-out of the Settlement Class; the Objection Deadline for Settlement Class Members to object to the Settlement and/or the Application for Attorneys' Fees, Costs, and Service Awards; the Final Approval Hearing date; and the Settlement Website address at which Settlement Class Members may access [the Settlement] Agreement and other related documents and information. Kroll will also establish a Settlement Website to provide Class Members with all relevant information and documents, including the Settlement Agreement, Claims and Notice Forms, and Court orders. Moreover, Kroll will perform reasonable address trace efforts for any Postcards that are returned as undeliverable.

[*Id.* (citation modified)]. Class Members wishing to opt-out will be required to postmark their request to Kroll. Class Members with objections must "must mail a letter to the Clerk of the Court, Class Counsel, Defendant's Counsel, and the Settlement Administrator," containing certain information as set forth in the Settlement Agreement. [*Id.* at 987 (listing nine criteria required to be addressed in objection letter)].

### 4. *Fees, Expenses, and Service Awards*

Under the Settlement Agreement, Class Counsel will apply to the Court for an award of attorneys' fees of "up to $3,481,750.00, which equates to 33% of the Settlement Fund and significantly less than one-third of the value of Cash Payment A – Documented Losses, and Credit Monitoring, made available through the Settlement." [*Id.* at 988]. Only a portion of the award will come from the Settlement Fund. "If approved, $1,740,750.00 shall be payable out of the Settlement Fund and $1,741,000.00 payable directly" by PharMerica. [*Id.*]. The Settlement Agreement also provides for reimbursement of Class Counsel's reasonable costs incurred, as well as service awards of "$3,500" Service Award for each of the named Plaintiffs. [*Id.*].

### 5. *Release*

Finally, in consideration for the benefits conferred to the Class Members, the Settlement Agreement provides that "all Class Members who do not timely and validly opt out" will release PharMerica from "any and all past, present, and future claims and causes of action related to the Data Incident." [*Id.* at 989].

### B. Settlement Approval

On January 12, 2026, the Court preliminarily approved the Settlement. [DN 151]. As a result, Kroll implemented the Court-approved Notice Plan. [DE 164 at 1213]. Plaintiffs report that direct notice reached approximately 73.72% of the Settlement Class. [*Id.*]. "[O]f the 1.45 million Class Members who received direct notice, there were four (4) timely opt-out requests, one (1) late opt-out request, and no objections to the Settlement by the deadline of April 13, 2026." [*Id.* at 1214 (citing DE 164-2 (supplemental Kroll declaration))].

On May 12, 2026, the Court held the Final Approval Hearing to consider the fairness of the Settlement Agreement, hear any objections, and determine whether to grant final approval.

[DE 162]. The Court ordered supplemental briefing on the "commonality" requirement under Fed. R. Civ. P. 23(a)(2) in light of *Speerly v. Gen. Motors*, LLC, 143 F.4th 306, 316 (6th Cir. 2025). The Court also asked for supplemental documentation regarding the adequacy of relief and the reasonableness of the requested attorney's fees, costs, and service awards.

### III. DISCUSSION

#### A.  Class Settlement

The claims of a "class proposed to be certified for purposes of settlement" may be settled "only with the court's approval." Fed. R. Civ. P. 23(e); *see also Wayside Church v. Van Buren Cnty., Michigan*, 103 F.4th 1215, 1222 (6th Cir. 2024). Under Rule 23(e), "class action settlement approval involves a three-step process": (1) "preliminary approval of the proposed settlement," (2) "notice of the settlement to all affected class members," and (3) a "final approval hearing." *Garner Props. & Mgmt., LLC v. City of Inkster*, 333 F.R.D. 614, 620 (E.D. Mich. 2020) (quotation mark omitted); *see also Thacker v. Chesapeake Appalachia, LLC*, 259 F.R.D. 262, 270 (E.D. Ky. 2009) (citing *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier,* 262 F.3d 559, 565–66 (6th Cir. 2001)).

At step one, the parties must show "that the court will likely be able to" both (1) approve the proposed settlement as "fair, reasonable, and adequate" and (2) "certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)–(2). "[I]f giving notice is justified by the parties' showing," the Court "must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1)(B). At step two, after receiving notice, "[a]ny class member may object to the proposal." Fed. R. Civ. P. 23(e)(5)(A). At step three, a hearing must take place before the Court finally approves any class-action settlement. Fed. R. Civ. P. 23(e)(2).

6

This matter has proceeded through all three steps. The Court will first address the concerns raised at the Final Approval Hearing. With respect to commonality, Plaintiffs observe that "data breach actions are typically and customarily advanced on a class basis and courts in the Sixth Circuit and beyond routinely grant class certification." [DE 164 at 1215 (collecting cases)]. *See, e.g., Savidge v. Pharm-Save, Inc.*, 727 F.Supp.3d 661, 709 (W.D. Ky. 2024), *amended*, No. 3:17-CV-186-CHB, 2025 WL 964446 (W.D. Ky. Mar. 31, 2025) ("To summarize the Court's ruling on class certification under Rule 23(b), the Court finds that common questions of law or fact predominate over individual ones; a class action is superior in this case; and the class is readily ascertainable.").

The Court finds that any issues implicated by *Speerly* are mitigated by the fact that "the Data Incident was a single, identifiable event, not a series of product failures." [DE 164 at 1223]. Further, each of the claims require proof of an element which turns on PharMerica's conduct with respect to that breach—i.e., whether PharMerica's cybersecurity practices, policies, and safeguards were adequate. [*See generally* DE 164 at 1216–19]. These common questions satisfy the commonality requirement. *See, e.g., In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2009 WL 5184352, at *3 (W.D. Ky. Dec. 22, 2009) (finding "whether [defendant] acted negligently in collecting and storing Settlement Class Members' Private Information" presented a common question of law or fact); *In re Cinfed Fed. Credit Union Data Breach Litig.*, 2025 WL 1637686, at *6 (holding "whether Cinfed negligently secured their personal data" was a common question). Accordingly, Plaintiffs have shown that the class certification is appropriate even in light of the heightened standard announced in *Speerly.*

Next, the Court is satisfied that the relief provided for in the Settlement Agreement is adequate. Although the Court expressed some concerns at the reported claims rate of the

approximately .14% at the time Plaintiffs moved for final approval, [DE 156], more claims were submitted and processed before the claims deadline and Kroll now reports a "claims rate of 0.50%." [DE 164 at 1225]. Many courts have approved settlements with claims rate of less than one percent. *See, e.g., Poertner v. Gillette Co.*, 618 F. App'x. 624, 625–26 (11th Cir. 2015) (approving a settlement involving more than seven million class members where the claims rate was roughly 0.75%); *LaGarde v. Support.com, Inc.*, Case No. 13-609, 2013 WL 1283325, at *2–10 (N.D. Cal. Mar. 26, 2013) (approving class action settlement with a claims rate 0.17% and noting 92% of the class members received notice via email); *In re Apple iPhone 4 Prods. Liab. Litig.*, Case No. 10-2188, 2012 WL 3283432, at *1–3 (N.D. Cal. Aug. 10, 2012) (approving a class action settlement with claims rate between 0.16% and 0.28%). Further, as noted by Plaintiffs, this "claims rate is in line with several other class settlements that involved data breaches of large healthcare entities or other large stores of sensitive consumer information." [DE 164 at 1225 (collecting cases)]. *See, e.g., In Re: HCA Healthcare Inc. Data Security Litigation*, No. 3:23-cv-684 (M.D. Tenn. 2025) (settlement approved in breach of large hospital organization that affected over 11 million HCA patients with .23% claims rate).

The Court further notes that all Settlement Class Members will automatically receive one year of Credit Monitoring, through Kroll Complete Monitoring, without having to file a Claim Form. [DE 146-1 at 1020]. Kroll Complete Monitoring includes "credit monitoring, dark web monitoring, pay day loan monitoring, social security scan, fraud consultation, identity theft restoration services (including victim assistance and customer support), $1,000,000 of insurance coverage for fraud and/or identity theft with no deductible, credit score reporting, and real-time inquiry alerts." [*Id.*]. The one-year period commences "when Settlement Class Members use their

activation codes," [*id.*] which may be done "once the Settlement receives Final Approval." [DE 164-2 at 1261].

Accordingly, for good cause shown, and as detailed further below, the Plaintiffs' motion for final approval of the Settlement [DE 156] is **GRANTED**.

### B. Attorneys' Fees

"The party seeking attorneys' fees bears the burden of proving the reasonableness of the hourly rates claimed." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011) (quoting *Granzeier v. Middleton*, 173 F.3d 568, 577 (6th Cir. 1999)). When considering an award of attorney fees, a court must first determine what fee is "reasonable." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). A reasonable award is "one that is adequately compensatory to attract competent counsel yet which avoids producing a windfall for lawyers." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000). The Sixth Circuit recognizes two methods for calculating attorney fees in common fund cases: the percentage-of-the-fund method and the lodestar method. *Gascho v. Glob. Fitness Holdings, LLC*, 822 F.3d 269, 279 (6th Cir. 2016). The Court has "the discretion to select the particular method of calculation, but must articulate the reasons for adopting a particular methodology and the factors considered in arriving at the fee." *Id.* at 280 (quoting *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009)) (citation modified).

Although optional, Courts employing a percentage-of-the-fund method often "crosscheck" the reasonableness of the percentage award with a lodestar calculation. *Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 628 (6th Cir. 2020). This figure is determined "by multiplying the proven number of hours worked by a court-ascertained reasonable hourly rate." *Ellison v. Balinski*, 625 F.3d 953, 960 (6th Cir. 2010) (citing *Hensley*, 461 U.S. at 433).

Courts in this circuit have opted to apply the percentage-of-the-fund method where it is "consistent with the fee arrangement between Plaintiff and class counsel." *In re Amazon.com, Inc., Fulfillment Ctr. Fair Lab. Standards Act & Wage & Hour Litig.*, No. 3:14-CV-290-DJH, 2024 WL 5362024, at *5 (W.D. Ky. Dec. 23, 2024), *dismissed sub nom., In re Amazon.com, LLC, Fulfillment Ctr. Fair Lab. Standards Act (FLSA) & Wage & Hour Litig.*, No. 25-5057, 2025 WL 1233629 (6th Cir. Apr. 14, 2025). *See also Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 789 (N.D. Ohio 2010) (citing *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993) (explaining the percentage-of-the-fund method is generally "the preferred method for common fund cases").

Because a percentage-of-the-fund approach is consistent with the fee arrangement in this case, [DE 164 at 1233], the Court begins by evaluating whether Plaintiffs' requested fee is reasonable under this method. When conducting a percentage of the fund analysis, courts must calculate the ratio between attorney's fees and benefit to the class. *Gascho*, 822 F.3d at 282.

Here, Plaintiffs request "an award of attorneys' fees of $3,481,750.00." [DE 164 at 1226]. Pursuant to the terms of the Settlement Agreement, "if approved, $1,740,750.00 will be paid out of the Settlement Fund (equaling 33% of the common fund)," with the remaining "$1,741,000.00 payable directly from [PharMerica]." [*Id.*]. Although Plaintiffs argue that "the sum of the requested fees equates to 33% of the Settlement Fund," [*id.* at 1332], the fact "[t]hat the defendant will pay the attorneys' fees from its own funds . . . does not limit the court's obligation to review the reasonableness of the agreed-to fees." *Strong v. BellSouth Telecommunications, Inc.*, 137 F.3d 844, 849 (5th Cir. 1998). The numerator in this case is therefore $3,481,750.00, or approximately 66% of the Settlement Fund.

10

Calculating the denominator is less straightforward. As the Sixth Circuit has recognized, "[d]etermining the appropriate relationship between fees and benefits to the class . . . can be significantly impacted by the facts of a case." *Gascho*, 822 F.3d at 284. "[T]he denominator is the dollar amount of the Total Benefit to the class (which includes the 'benefit to class members,' the attorney's fees and may include costs of administration)." *Id.* at 282. Plaintiffs argue that the total benefit to the class includes not only the common fund "but also the claims made portion including payment of claims for documented out-of-pocket expenses up to $10,000 per Class Member and one year of Kroll Complete Monitoring on a claims-made basis." [DE 164 at 1232]. Most significantly, Plaintiffs value Kroll Complete Monitoring at "$236,734,948.08." [*Id.*]. Thus, taken together with "the common fund of $5,275,000.00, and the half of the attorneys' fees paid directly by PharMerica of $1,741,000," Plaintiffs assert "the total value of the Settlement is $243,750,948.08." [*Id.*].

Courts around the country "recogniz[e] the benefit of credit monitoring, use its retail cost as evidence of value, and consider that value in awarding fees." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, No. 1:17-MD-2800-TWT, 2020 WL 256132, at *38 (N.D. Ga. Mar. 17, 2020) (collecting cases), *reversed on other grounds*, 999 F.3d 1247 (11th Cir. 2021). *See also In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3341200, at *9 (W.D. Ky. Aug. 23, 2010) ("Adding the $6.5 million fund for class members and the potential costs of $7 million for the credit monitoring package offer, plus the $3.5 million for attorneys' fees, the monetary amount for attorneys' fees is about 20% of that total."); *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395, 409 (D. Mass. 2008) (expressing doubt at value of settlement but finding fee award was reasonable because the $177 million retail value of the credit monitoring was "a benchmark against which to measure the award of attorneys' fees").

11

Although the low claims rate suggests that the actual benefit of the credit monitoring is less than the approximate face value of $236 million estimated by Plaintiffs,[2] there is no doubt that a substantial benefit was conferred because Class Members are entitled to credit automatically—regardless of whether a claim is made. The Sixth Circuit has affirmed that "making claims available to all class members provides them with a benefit." *Gascho*, 822 F.3d at 286. At the very least, Plaintiffs have shown the requested fee is less than two-thirds of the total benefit conferred to the Settlement Class. [DE 156 at 1122].

The Court next considers whether the proposed award of attorney fees is reasonable. The Sixth Circuit has identified six factors which govern the reasonableness of class action fees:

> (1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides.

*Bowling v. Pfizer, Inc.,* 102 F.3d 777 (6th Cir. 1996).

Here, the first, second, third, fourth, fifth, and sixth factors all weigh in favor of the requested fee. As noted in the Preliminary Approval Order, the Settlement Agreement "provides Class Members with substantial relief for past and future losses due to the Data Incident." [DE 151 at 1102]. As for past losses, it is notable that "the Claims-Made Fund is separate from the Settlement Fund and Class Members' claims will not be subject to depletion based on the number of actual claims made." [*Id.*]. As for future relief, the provisions regarding "Business Practice Changes" and the automatic entitlement to Kroll Complete Monitoring will benefit of the entire

---

[2] The Settlement Administrator stated that Kroll's "Credit Monitoring Services" cost "$339,000, charged at a flat rate, to provide credit monitoring codes to all Settlement Class Members sent direct notice." [DE 164-2 at 1259].

Settlement Class going forward. [*See* DE 146-1 ¶¶ 71–72]. Next, the attorneys on both sides are highly experienced in complex litigations. Plaintiffs' attorneys were retained on a contingency fee basis and, as other courts have noted, society has a strong interest in rewarding plaintiff attorneys who take on such cases. *See In re CorrectCare Data Breach Litig.*, No. CV 5:22-319-DCR, 2024 WL 4211480, at *4 (E.D. Ky. Sept. 17, 2024) ("[S]ociety has a significant interest in rewarding attorneys who prosecute . . . data breach [class actions]. . . ."). The fifth factor—the complexity of the litigation—also weighs in favor of the requested award. This litigation was challenging. It involved laws spanning many state jurisdictions, centered on unsettled data breach litigation, and Plaintiffs had to overcome a motion to dismiss before reaching this stage.

Finally, the Court considers the second factor in conjunction with the lodestar crosscheck. Plaintiffs state that the value of their services rendered on an hourly basis is approximately "$1,172,900.42." [DE 164 at 1233]. The requested fee award of $3,481,750.00 thus results in a multiplier of "2.96." [*Id.* at 1235]. Although Plaintiffs assert that "[c]ourts have generally held that lodestar multipliers falling between 2 and 4.5 demonstrate a reasonable attorneys' fee," [DE 164 at 1233 (quoting *In re Retina Grp. of Washington Data Sec. Incident Litig.*, No. DKC 24-0004, 2025 WL 2030241, at *13 (D. Md. July 21, 2025))], the Sixth Circuit has cautioned that a multiplier of 1.75 "is near the upper end" of what is considered "reasonable." *Barnes v. City of Cincinnati*, 401 F.3d 729, 747 (6th Cir. 2005). Nevertheless, a review of more recent cases shows that a multiplier of 3 is within the range of those ordinarily approved in large class actions. *See Lucyk v. Materion Brush Inc.*, No. 3:20-CV-2340, 2023 WL 4405280, at *6 (N.D. Ohio July 7, 2023) (finding "multiplier of 2.7, well within the accepted range"); *Lowther v. AK Steel Corp.*, 2012 WL 6676131, at *5 (S.D. Ohio Dec. 21, 2012) (approving a 3.06 multiplier and citing cases that found multiplier ranging from 4.3 to 8.5 to be reasonable). *See also Newberg on Class Actions*

§ 14.6 (4th ed. 2009) ("Multiples ranging from one to four frequently are awarded in common fund cases when the lodestar method is applied.").

Accordingly, the Court is satisfied that the requested fee will provide adequate compensation without producing a windfall for Class Counsel. *Adcock-Ladd*, 227 F.3d at 349. Plaintiffs' request for an attorney fee award of $3,481,750 is **GRANTED**.

### C. Costs

Under the common fund doctrine, "class counsel is entitled to reimbursement of all reasonable out-of-pocket litigation expenses and costs in the prosecution of claims and settlement, including expenses incurred in connection with document production, consulting with experts and consultants, travel and other litigation-related expenses." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003). In determining whether the requested expenses are compensable, the Court has considered "whether the particular costs are the type routinely billed by attorneys to paying clients in similar cases." *Id.* (citing *In re Synthroid Marketing Litig.*, 264 F.3d 712, 722 (7th Cir. 2001)).

Here, Plaintiffs seek reimbursement of $88,328.16 in expenses. [DE 164 at 1236]. At the Court's request, Class Counsel provided supporting documentation of filing fees, pro hac vice fees, court reporting fees, Westlaw charges, and, most notably, "costs associated with accessing the Limited Access Death Master File (LADMF), necessary to determine those Class Members who are deceased." [*Id.*]. All the expenses appear reasonably necessary to conduct this litigation. Plaintiffs' request for costs is **GRANTED**.

### D. Incentive Payments

Incentive payments, or "service awards," generally "do[ ] not raise a red flag" in this context "because the class representative and class member are not similarly situated in regard to

14

. . . the incentive payment: the class representative did extra work and took extra risk to earn that." *Newberg on Class Actions* § 13:56. Requests for incentive awards are nevertheless "scrutinized carefully" considering the concern that such payments "may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) (citing *Newberg on Class Actions* § 11.38 (3d ed. 1992)).

Although the Sixth Circuit has not defined the outer limits for service awards, a survey of the precedent suggests service awards are appropriate if, absent proof of the lead plaintiff's extraordinary involvement, they are at most 10 times the amount that the unnamed class members would receive. *See, e.g., Garner Props. & Mgmt. v. City of Inkster*, 333 F.R.D. 614, 626 (E.D. Mich. 2020) (reducing incentive award from the "100 times greater" $10,000 incentive award to a "10 times greater" incentive award of $1,000); *Hodges v. 77 Grandville*, No. 19-81, 2022 WL 456769 at *3 (W.D. Mich. Feb. 15, 2022) (denying incentive award of $10,000 because it was 50 times greater than what the unnamed class members would have received).

Here, Plaintiffs request "service awards of $3,500 to each of the Class Representatives." [DE 164 at 1237]. In comparison, based on the claims rate, the average recovery for most of Settlement Class would be much lower. Setting aside claims for Documented Losses, the average claimant will receive approximately $200, as well as one year of Kroll Complete Monitoring, which Plaintiffs value at approximately $120. [*See id.* at 1232 ("similar products like Aura range at $9.99 per month"]. The requested award of $3500 therefore represents a little over 10 times that value and is at the upper end of the presumptively permissible range allowed in this Circuit. *See e.g., Sellards v. Midland Credit Mgmt., Inc.*, No. 1:20-CV-02676, 2023 WL 3869023, at *6 (N.D. Ohio May 2, 2023), report and recommendation adopted, No. 1:20-CV-02676, 2023 WL 3641447

(N.D. Ohio May 25, 2023) (finding service award "10 times that of the class members" did "not reflect the type of disproportionality typically requiring the court to step in"). As the court noted in *Sellards*, "[w]henever the sum needed to make individual class members whole is relatively small, even a modest incentive payment, as here, will always be a large multiple of the compensatory payment to class members." *Id.* Such is the case here, where most members of the Settlement Class may be unable to quantify damages, now or ever. And in the case of those who do suffer quantifiable damages, the recovery provided is much larger—up to $10,000 in Documented Losses and identity theft protection through Kroll Complete Monitoring. Thus, regardless of the yardstick against which the requested awards are compared, the awards are reasonable and in line with those awarded in similar data breach class actions. *See, e.g., In re CorrectCare Data Breach Litig.*, 2024 WL 4211480, at *5 (approving service awards of $2,500 for each of the give (5) plaintiffs).

Plaintiffs' request for service awards is **GRANTED**.

### IV. CONCLUSION

The Court has considered all matters submitted to it at the Final Approval Hearing, the pleadings on file, the applicable law, and the record. For the reasons discussed herein, Plaintiffs' Motion For Final Approval Of Class Action Settlement, And For Attorneys' Fees, Expenses, And Class Representative Service Awards [DE 156] is **GRANTED**. The Court **ORDERS** as follows:

1. This Final Judgment and Order of Dismissal incorporates by reference the definitions in the Settlement Agreement, and all capitalized terms used, but not defined, herein shall have the same meanings as in the Settlement Agreement.

2. This Court has jurisdiction over the subject matter of this lawsuit and jurisdiction over the Class Representatives and Defendant in the above-captioned case (the "Parties").

3.      The notice provisions of the Class Action Fairness Act, 28 U.S.C. § 1715, have been satisfied.

4.      The Court finds that the proposed Settlement Class, defined as follows, meets the requirements for certification for purposes of entry of judgment:

"All living persons in the United States who were provided notice of the Data Incident."

Excluded from the Settlement Class are [A]ll persons who are directors and officers of Defendant, governmental entities, anyone who validly and timely opts out of the Settlement, and the judge(s) assigned to the Action, the Judge's immediate family, and Court staff.

5.      Except as to any individual claim of those Persons who have validly and timely requested exclusion from the Settlement Class ("Opt-Outs"), the Action and all claims contained therein, as well as all of the Released Claims, against Defendant and the Released Parties by the Releasing Parties are dismissed with prejudice. The Settling Parties are to bear their own costs, except as otherwise provided in the Settlement Agreement and the orders of this Court.

6.      Upon the Effective Date: (i) Plaintiffs and each of the Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged against the Released Parties (whether or not such Settlement Class Member executes and delivers a Proof of Claim and Release form) any and all Released Claims; and (ii) Plaintiffs and each of the Settlement Class Members and anyone claiming through or on behalf of them, shall be permanently barred and enjoined from the commencement, assertion, institution, maintenance or prosecution of any of the Released Claims against any Released Parties in any action or other proceeding in any court of law or equity, arbitration tribunal, administrative

17

forum, or forum of any kind. Claims to enforce the terms of the Settlement Agreement are not released.

7.    The distribution of the Notice to the Settlement Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process, constitute the best notice practicable under the circumstances, and constitute due and sufficient notice to all Persons entitled to notice.

8.    The Court has reviewed Plaintiffs' request for attorneys' fees and finds that their request for $3,481,750.00 in fees, from which $1,740,750.00, is payable from the Settlement Fund and $1,741,000.00 payable directly by PharMerica, separate and apart from the Settlement Fund plus $88,328.16 in reimbursement for litigation costs is reasonable and is hereby granted.

9.    The Court has reviewed Plaintiffs' request for Service Awards in the amount of $3,500 each is reasonable and is hereby granted.

10.    All objections have been considered and overruled.

11.    Neither the Settlement Agreement nor the Settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the Settlement: (a) is or may be deemed to be or may be used as an admission or evidence of the validity of any Released Claim, or of any wrongdoing or liability of Defendant and the Released Parties; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of Defendant and the Released Parties in any civil, criminal, or administrative proceeding in any court, administrative agency, or other tribunal. The Settlement Agreement may be filed in an action to enforce or interpret the terms of the Settlement Agreement, the Settlement contained therein, and any other documents executed in connection with the performance of the Settlement embodied therein. Defendant and the Released Parties may file the

Settlement Agreement and/or this Final Judgment and Order of Dismissal in any action that may be brought against them in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, full faith and credit, release, good faith settlement, judgment bar, or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

12.    Without affecting the finality of this Final Judgment and Order of Dismissal in any way, this Court retains continuing and exclusive jurisdiction over: (a) implementation and enforcement of the terms set forth in the Settlement Agreement; (b) any award, distribution, or disposition of the Settlement Fund, including interest earned thereon; (c) hearing and determining applications for attorneys' fees, costs, expenses including expert fees, and incentive awards; and (d) all Settling Parties, Released Parties, and Releasing Parties for the purpose of construing, enforcing, and administering the Settlement Agreement.

13.    In the event that the Settlement does not become effective in accordance with the terms of the Settlement Agreement, then this Final Order and Judgment of Dismissal shall be rendered null and void and shall be vacated. In such event, all orders entered and releases delivered in connection herewith shall be null and void, and the Settling Parties shall be deemed to have reverted to their respective status in the Action as of the Execution Date, and, except as otherwise expressly provided herein, the Settling Parties shall proceed in all respects as if the Settlement Agreement and any related orders had not been entered.

14.    The Parties are directed to consummate the Settlement according to the terms of the Settlement Agreement. Without further Court order, the Parties may agree to reasonable extensions of time to carry out any of the provisions of the Settlement Agreement.

15.     There is no just reason for delay in the entry of this Final Judgment and Order of Dismissal. The Clerk of the Court is directed to enter this Final Judgment and Order of Dismissal pursuant to Rule 54(b) of the Federal Rules of Civil Procedure immediately.

**THERE BEING NO JUST REASON FOR DELAY, LET JUDGMENT BE ENTERED ACCORDINGLY.**

Rebecca Grady Jennings, District Judge
United States District Court

June 29, 2026